UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

BECKY SPENGLER
7206 Marissa Circle
Sobieski, Wisconsin 54171

       Plaintiff

v.                                        Case No.  22-CV-1199

CESA 7
595 Baeten Road
Green Bay, Wisconsin 54304

and

WISCONSIN DEPARTMENT OF
PUBLIC INSTRUCTION
125 S. Webster Street
Madison, Wisconsin 53703

       Defendants.

---

**PLAINTIFF'S SECOND AMENDED VERIFIED COMPLAINT**

---

COMES NOW Plaintiff Becky Spengler by and through her attorneys, the Law Firm of

Conway, Olejniczak, & Jerry, S.C., and for her Second Amended Verified Complaint against

Defendants CESA 7 and the Wisconsin Department of Public Instruction does state, allege and

claim the following:

<u>**THE PARTIES**</u>

1.  Plaintiff Becky Spengler is an adult who resides at 7206 Marissa Circle, Sobieski,

Wisconsin 54171.  Plaintiff is directly employed by Defendant CESA 7 and is indirectly

employed by Defendant Wisconsin Department of Instruction ("DPI").

1

2. Defendant DPI is an agency of the State of Wisconsin located at 125 S. Webster St., Madison, Wisconsin 53703. DPI is assigned to administer public education in the State.

3. Defendant CESA 7 is a non-profit entity located at 595 Baeten Rd., Green Bay, Wisconsin 54304. CESA 7 is a contractor retained by DPI to assist 38 public school districts ("the Districts") in northeastern Wisconsin.

4. "CESA" is an acronym for Cooperative Educational Service Agency. CESA 7 is one of 12 CESAs in the State of Wisconsin. Each CESA is assigned to a different geographic territory within the State, and each CESA supports the school districts located within the assigned territory. Each CESA provides information, support, training and assistance to the school districts and the administrators and educators in the school districts on various topics including, but not limited to, special education, achievement gaps, socio-economic status, and race.

5. Each CESA - including CESA 7 - is funded by dollars from the State of Wisconsin and the federal government. DPI controls the distribution of both state and federal dollars to each CESA.

6. DPI also controls the substantive operations of each CESA. For example, DPI controls a large portion of the subject matter of services provided by each CESA, the methodology and materials used in performing the work, the time table to perform the work, and the qualifications of the people employed by each CESA to perform the work. Employees of the CESAs who perform the work for DPI meet regularly (at least one time each month for at least a full day) with DPI, and they regularly report to DPI. DPI critiques the work performed and provides training and direction to employees of the CESAs regarding how the work must be performed. DPI largely controls the who, the when and the how of the work that is performed by the CESAs and their employees, including Plaintiff and CESA 7.

2

## NATURE OF THE ACTION

7. This action is brought by Plaintiff under Title VI of the Civil Rights Act of 1964 (42 U.S.C. §2000d, et seq.), Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e, et seq.), 42 U.S.C. §1983 (i.e. "Section 1983"), and the Family Medical Leave Act (29 U.S.C. §2601, et seq.) against her employers, Defendants, alleging (i) that, based on her race, Defendants unlawfully excluded her from, subjected her to discrimination under, and denied her the benefits of, programs and activities that received federal financial assistance; (ii) that Defendants unlawfully discriminated against her based on her race and retaliated against her because she opposed Defendants' unlawful and racist agenda, policies, attitudes and actions; (iii) that, while acting under color of state law, CESA 7 subjected Plaintiff to deprivation of right, privileges and immunities secured by the U.S. Constitution and federal law; and (iv) that CESA 7 unlawfully interfered with, restrained and denied rights provided to Plaintiff under the FMLA.

## JURISDICTION AND VENUE

8. Plaintiff's claims are based upon, and arise out of, Defendants' violations of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §2000d, et seq.); Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e, et seq.); violations of Section 1983, (42 U.S.C. §1983); and CESA 7's violations of the Family Medical Leave Act (29 U.S.C. §2601, et seq.) This Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §1331.

9. Plaintiff resides in this judicial district, Defendant CESA 7 is located in this judicial district and both Defendants "reside" in this State, and both Defendants regularly do business in this judicial district. Moreover, all or nearly all of the events at issue in this case occurred in this judicial district. Therefore, venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1), (2).

3

10. Plaintiff has fulfilled all administrative prerequisites to this action.

11. On June 10, 2022, Plaintiff mailed a letter to the EEOC in Milwaukee in which she set forth her claims against Defendants. The date stamp on her correspondence indicates that the EEOC received her letter on June 14, 2022.

12. On June 21, Plaintiff called the EEOC and was told that she could immediately request a right to sue letter directly and without the benefit of an EEOC investigation.

13. On June 22, 2022, Plaintiff's attorney faxed correspondence to the EEOC and requested that "the EEOC promptly issue a Notice of Right to Sue letter … giving [Plaintiff] the right to pursue all of the charges, allegations and claims raised in her June 10, 2022 correspondence against both the Wisconsin Department of Public Instruction and CESA 7."

14. On June 23, 2022, the EEOC responded to counsel's correspondence confirming receipt of Plaintiff's complaint and counsel's letter and indicating that, "the filing date for this matter is June 14, 2022." The EEOC also indicated that separate charge numbers would be assigned for the complaints against each Defendant.

15. On July 15, 2022, a representative of the EEOC called counsel and again stated that Plaintiff's June 10 letter would be treated as Plaintiff's Charge of Discrimination, and that the filing date of that Charge was June 14, 2022. The EEOC spokeswoman also again indicated that the EEOC would create a separate Charge and assign a separate Charge number for the complaints raised against each Defendant.

16. The EEOC assigned case number 443-2022-2338 to the Charge filed against DPI and case number 443-2022-2492 to the Charge filed against CESA 7.

17. On July 18, 2022, the EEOC forwarded the Charge filed against DPI (No. 443-2022-2338) to the U.S. Department of Justice for processing. On July 25, 2022, the DOJ notified

4

Plaintiff that she "has the right to institute a civil action under Title VII" against DPI on Charge No. 443-2022-2338.

18. On August 8, 2022, Plaintiff filed a second Charge of Discrimination against DPI (No. 443-2022-2992) based on events occurring in the workplace after the filing of her first Charge. The EEOC forwarded that Charge to the U.S. Department of Justice for processing. On September 15, 2022, the DOJ notified Plaintiff that she "has the right to institute a civil action under Title VII against DPI" on Charge No. 443-2022-2992.

19.a. Also on August 8, 2022, Plaintiff amended the Charge filed against CESA 7 that was still pending with the EEOC (No. 443-2022-2492). On August 24, 2022, the EEOC issued a "Notice of Right to Sue" on Charge No. 443-2022-2492, as amended.

19.b. On or about December 15, 2022, Plaintiff filed another Charge of Discrimination with the EEOC (No. 443-2023-00718) against CESA 7 based on events occurring in the workplace after the filing of her prior Charges. On January 24, 2023, the EEOC issued a "Notice of Right to Sue" to Plaintiff on Charge No. 443-2023-00718.

20. Plaintiff has filed timely Charges with the EEOC in which she enumerates her claims against both Defendants, and the EEOC and U.S. DOJ have issued notices to Plaintiff indicating that they were terminating their investigations into those claims and were advising Plaintiff of her rights to file this lawsuit.

21. Plaintiff has fulfilled all administrative prerequisites to filing this action against both Defendants.

## THE FACTS

**A. Plaintiff's Roles with DPI and CESA 7.**

22. Plaintiff was hired by CESA 7 in 2016. At times relevant to this dispute, Plaintiff's official job title with CESA 7 was Director of Integrated Services.

23. In Plaintiff's role as Director of Integrated Services, her duties fell into two distinct categories. First, Plaintiff worked as a Director providing technical assistance under a Regional Special Education Network ("RSN") grant. In that role, Plaintiff was sometimes referred to as an "RSN Director". As an RSN Director, Plaintiff was responsible to provide assistance to the 38 Directors of Special Education for each school district in CESA 7's territory. Plaintiff spent approximately 75% of her work time as an RSN Director.

24. Second, Plaintiff served as a coach for administering a Research to Practice Inclusive Communities ("RPIC") grant. In that role, Plaintiff was sometimes referred to as an "RPIC Coach". In that role, Plaintiff supported one school district within CESA 7's territory that was receiving funding to implement a prescribed continuous improvement model of inclusive learning environments. Plaintiff spent approximately 25% of her work time in her role as RPIC Coach.

25. Both of Plaintiff's roles - RSN Director and RPIC Coach - were funded by government grants controlled by DPI and distributed to the CESAs. On information and belief, such grants included funding from both the state and the federal governments, and - at times relevant to this lawsuit - both Defendants received state and federal financial assistance. Each month and for each grant, Plaintiff and the employees of each CESA who held similar roles were required to meet with DPI for at least one full day to discuss progress, problems, performance, strategy and related issues. Thus, Plaintiff was required to meet with DPI for at least two full days each month.

6

26. Throughout Plaintiff's employment with CESA 7, DPI controlled and approved all funding for the work performed by Plaintiff. At no point did DPI or CESA 7 ever refuse to "sign-off" on Plaintiff's work. Nor did DPI or CESA 7 ever complain about the work she performed, or otherwise legitimately assert that Plaintiff had failed to provide all agreed-upon "deliverables." Plaintiff fully, properly, and effectively performed all functions of her position as Director of Integrated Services.

27. In October of 2021, at a time when the standard raise for employees of CESA 7 was 2.5%, Plaintiff received a 5% raise.

**B. DPI Documents Advocating Racism and Racist Ideology.**

28. Numerous documents published and used by DPI are peppered with implicit and express racist and race-based stereotypes, generalizations, criticism and hostility directed at the white race. The Oxford Dictionary defines "racism" as "the belief that different races possess distinct characteristics, abilities, or qualities, especially so as to distinguish them as inferior or superior to one another." Documents provided by DPI promulgate and promote racism. For example, many DPI documents and other communications include racially discriminatory stereotypes and generalizations about the entire white race, claims that all members of the white race have certain negative characteristics including racial bias and white privilege, and instructions regarding how all white educators and administrators must overcome their inherent racist attitudes, beliefs and behaviors. These documents were given to Plaintiff with direction from DPI that Plaintiff learn and adopt the processes and principles set out in those documents and share those processes and principles with the school districts in CESA 7's territory. Although Plaintiff disagreed with DPI's racism and many of the processes and principles espoused by DPI, she did as she was

7

directed and effectively shared those processes and principles with the school districts in CESA 7's territory.

29. Examples of the racist documents and the racism found in DPI's documents include:

a. In or around September of 2017, under the leadership of State Superintendent Tony Evers, DPI published a document entitled, "Equity: Wisconsin's Model to Inform Culturally Responsive Practices" (the "MICRP" document). At the heart of the MICRP document is this graphic:



b. DPI distributed the MICRP document to Plaintiff with direction that Plaintiff and other RSN Directors, RPIC Coaches and other grant recipients encourage school districts to adopt MICRP in their districts.

8

c.  The MICRP document discusses and explains the graphic at length. Among other

things, the MICRP document states:

(i)  "Becoming self-aware means that individuals recognize that we bring our race
and culture to every teaching and learning interaction and relationship.  Here, we
openly examine the way that our own culture shapes what we value, what we assume
to be 'right' or 'wrong', and how we act on those values and assumptions.  As schools
have historically reflected the norms of the dominant culture, those of us of the
dominant race or culture need to work especially hard to examine power, privilege
and bias, to see the invisible."

(ii)  "Each of us carries with us a lifetime exposure to societal biases about ability and
potential based on gender, race, ethnicity, social class, disability status, and English
language proficiency along with other characteristics and labels.  These assumptions,
unexamined, create barriers to providing historically marginalized students full access
to high expectations, authentic connections with educators and the school
environment, and rigorous coursework.  With this step, we own up to our implicit
biases and other hidden barriers to success in our classrooms and schools."

(iii)  "We recognize that the historical experiences and interactions of family and
community members with school and within the community vary considerably,
particularly for those whose race or culture has been historically marginalized by
schools."

(iv)  "Equity leaders learn, do and become.  They model "… integrity, advocacy,
conviction, and transparency to redress systemic inequities for diverse students,
families, and communities."

(v)  "The SKILL step compels us as a school system to recognize that our historical
policies and practices have benefitted some of our students at the expense of others.
We acknowledge our own practices and beliefs as the leverage points for change.  We
commit to adapting our school to the diversity of our students, not expecting our
students or families to abandon who they are in order to be successful…. Our
commitment to equity shows up in a congruence of attitudes, structures, policies, and
practices throughout the school and district."

d.  In or around September of 2021, when Jill Underly was state superintendent, DPI

distributed a document identified as "Coaching Competency Practice Profile" (the "CCPP"

document).  DPI distributed a copy of the CCPP document to Plaintiff, other RSN Directors,

RPIC Coaches and other grant recipients and instructed them to implement CCPP in their

school districts, including the districts in CESA 7's territory.

9

e. Among other things, the CCPP document provides:

(i). "The CCPP provides clear guidance for organizations to support their staff in developing an equity mindset as they become competent coaches."

(ii). "Whiteness" is "A dominant cultural space with enormous political significance, with the purpose to keep others on the margin…. Whiteness itself refers to the specific dimensions of racism that serve to elevate white people over people of color. This definition counters the dominant representation of racism in mainstream education as isolated in discrete behaviors that some individuals may or may not demonstrate, and goes beyond naming specific privileges."

(iii). "White Supremacy" is "An ideology, as a collection of ideas that encourage us to value whiteness (white norms, white culture and white people) more highly and above other cultures."

(iv) "Developing one's knowledge of self and understanding of the historical context of who has benefited and who has not is essential for effective, transformative system change. A coach must work toward the goal of seeking to redress inequities for each and every student … [and] work to dismantle biases and deficit mindsets and reform educational structures which have been constructed under systems of oppression."

(v) According to DPI and the CCPP, "*Expected*" behaviors and attitudes for Plaintiff

and the school employees that Plaintiff was to coach include:

a) "The willingness and ability to see and speak to how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others";
b) "The coach models self-awareness through transparency, vulnerability, and compassion when examining their social and personal identities";
c) "The coach intentionally disrupts the ways in which their social and personal identities uphold inequities";
d) "The coach surfaces the impact of white supremacy and the history of whiteness on systems, works to disrupt and dismantle its effects, and facilitates action planning to build a more equitable system of education in its place";
e) "The coach uses reflective resources, tools feedback, and discussion protocols to anticipate and address how systemic oppression impacts transformational change";
f) "The coach intentionally engages in their own learning about the history of systemic oppression";
g) "The coach regularly articulates the values, beliefs, biases and actions they bring to the coaching conversation and reflects on the impact of them".

(vi) According to DPI and the CCPP, "*Unacceptable*" behaviors and attitudes for

Plaintiff and the employees she was to coach include:

   a) "The coach is unwilling and/or unable to see and speak to how their power
      and privilege are at work to systematically advantage some while
      simultaneously disadvantage others";
   b) "The coach rarely models self-awareness through transparency, vulnerability,
      and compassion when examining their social and personal identities";
   c) "The coach does not recognize the ways in which their social and personal
      identities uphold inequities";
   d) "The coach does not recognize how the history of whiteness has impacted
      systems";
   e) "The coach does not consider how some protocols and resources may
      misrepresent marginalized students, staff, families, and communities";
   f) "The coach has no understanding of systemic oppression or excludes any
      discussion or consideration of it, resulting in the perpetuation of inequalities in
      the system";
   g) "The coach is unaware of how power and privilege play into others' influence
      and control within systems";
   h) "The coach interacts in negative or defensive ways, and/or is easily offended
      and/or fails to connect emotional responses to the beliefs and biases that
      underlie them".

30. Many other statements, materials and communications from DPI reflect DPI's racism

and its racist agenda, philosophy and attitudes all of which demonize the white race.

## C. Plaintiff Objects and DPI Responds.

31. While employed by DPI and CESA 7, Plaintiff frequently heard leaders of DPI and

many of her colleagues describe conservative political leaders such as Donald Trump and Scott

Walker as "racists." Plaintiff also heard these individuals frequently say that, any Americans

who would vote for conservative political candidates are "racists."

32. Eventually, Plaintiff made it known that, although she is a conservative voter, she is not

a racist. At one point during a monthly RSN meeting, the DPI representative assigned to lead the

RSN project told Plaintiff that, "Well, that certainly has been the elephant in the room. I thought

you were likely a Republican, and I don't know what to do with that." She added that, up to that

point, every one of the individuals involved in the RSN work for DPI had held the same Left-leaning views about race and "racial justice," and that DPI was not certain how to "deal with" Plaintiff.                                                                                            .

33. Later, Plaintiff declined to participate in a voluntary book study of the controversial book, "White Fragility: Why It's So Hard for White People to Talk About Racism." Plaintiff overheard a group of colleagues - including members of DPI leadership - discussing Plaintiff. Plaintiff heard one individual state that, "Becky is the one person who needs to participate in the book study about white privilege. Republicans never think they're racists." Another then repeated the worn-out lie that, anyone who supports Donald Trump is a racist.

34. Another DPI leader referred to any individual who refuses to embrace Critical Race Theory and its racist ideals as "gross."

35. The persistent negative comments, whispering and references to Plaintiff's alleged "racism" took a toll. Plaintiff felt intimidated, angry and fearful for her job. For many months, Plaintiff chose to bite her tongue during conversations regarding race and racial justice.

36. In July 2021, the Assistant Director of the DPI's Special Education Team joined the monthly RSN meeting. Before addressing the group, the AD asked that the recording of the meeting be turned off because she did not want anything that she might say to "come back to haunt [her]."

37.a. During the Q&A, Plaintiff respectfully asked the AD about DPI's use of the term "white privilege" and the propriety of DPI's stated plan to categorize students by their race. The AD did not answer Plaintiff's question and instead replied that Plaintiff's question was an indicator that DPI could not trust Plaintiff. Throughout the remainder of the same meeting, the

AD repeatedly stated that, "if you don't have an equity mindset, then perhaps this work isn't for you."

37.b. Despite the fact that Plaintiff successfully performed her role as Director of Integrated Services from the moment that she assumed that role until Defendants removed her from that role, Defendants repeatedly told Plaintiff and others that Plaintiff could not "do the work" assigned to her under the RSN and RPIC programs unless Plaintiff stopped questioning Defendants' assumptions and philosophy regarding race, Plaintiff "believed" and agreed with all of the tenets of those programs (including the racist ideals described above), and Plaintiff otherwise stated and demonstrated that she had an "equity mindset."

37.c. Among other things, Defendants also insisted that Plaintiff would not be permitted to continue in her role as Director of Integrated Services unless Plaintiff "demonstrated" her "commitment" (i) to coaching educators with "anti-racist" materials to be shared with students, (ii) to "examining [her] personal biases in the areas of race," (iii) to "dismantling racist … systems such as but not limited to engaging in professional learning to support interrogating the ways one's race, culture and understanding of ability inform the supports and services provided to adults in districts/schools including but not limited to: biases, stereotypes, prejudice and micro aggression; [and] educating others about systemic racism … and the need to dismantle [it]," (iv) to educating others about systemic racism and the need to dismantle it.

37.d. Further, Defendants insisted that Plaintiff "communicate in a manner consistent with DPI messaging, including messaging that is aligned with DPI's equity messaging and resources," and that she use the Coaching Competency Practice Profile and the Model to Inform Equity to support schools and districts.

13

37.e.  Defendants warned Plaintiff that, if she remained in the Director of Integrated Services role, she would need to fully embrace DPI's racist philosophy, actions and agenda, and that she could no longer question or voice disagreement with DPI's racist assumptions, philosophy, actions and agenda.  To that end, DPI indicated that they would single Plaintiff out for unique scrutiny and would monitor her conduct and her speech in ways that other similarly-situated individuals were not singled out or monitored.

37.f.  Further, DPI warned CESA 7 that, if Plaintiff questioned or voiced any objection to DPI's racism, then Plaintiff would be promptly removed from her role and the contracts for the RSN and RPIC work would be removed from CESA 7.

37.g.  Because Plaintiff declined to accept DPI's beliefs and to "demonstrate" that she embraced and agreed with DPI's racist philosophy, beliefs, actions, and agenda, Defendants removed her from her role as Director of Integrated Services.

37.h.  Defendants' insistence that Plaintiff cease expressing her views and that she instead "demonstrate" her agreement with Defendants' racist philosophy, conduct and actions violated Plaintiff's constitutional rights including her right to speak and to refrain from speaking.

38.  During the August 2021 monthly RSN meeting, Plaintiff respectfully asked for suggestions from the same AD about how to fix the achievement gap that - according to DPI - is caused by systemic racism.  Plaintiff also asked if DPI could provide information to support its claim that racism in America is "systemic."  The AD was visibly angered by Plaintiff's questions and declined to answer them.  After the meeting, DPI sent an email to the group that stated, among other things, "Only when you're aware of your blind spots and prejudices can you work to change the outcomes that follow from them…. "

14

39. In both the September 2021 monthly RSN meeting and the September 2021 monthly RPIC meeting, the groups discussed updates to the "Coaching Competency Practice Profile" (the "CCPP" document). Plaintiff noted that the "equity" provisions of the CCPP were "aggressive" and that, in light of the nation-wide backlash against Critical Race Theory in public schools, the leaders of the school districts in CESA 7's territory would likely have "no appetite for it."

40. In response to Plaintiff's concerns, members of both groups repeated that "the system" - including the Wisconsin education system - "continues to support white supremacy," and one member of the RSN group claimed that the Sunday school song "Jesus Loves the Little Children" is an example of how "the system" perpetuates racism and white supremacy.

41.a. Plaintiff successfully performed her role as Director of Integrated Services from the time she assumed that role until Defendants unlawfully removed her from that role. She regularly received positive feedback from school districts in her territory, she received performance-based increases in wages, and she received positive feedback from Defendants and from others.

41.b. Despite her positive job performance and track record, Defendants repeatedly informed Plaintiff that she could not properly perform the Director of Integrated Services job unless she believed and otherwise agreed with and embraced DPI's racist philosophy, programs, and actions. Defendants' conduct violated Plaintiff's constitutional rights including, but not limited to, her rights to speak and to refrain from speaking.

41.c. Plaintiff questioned DPI's racist philosophy, attitude and practices in her workplace and the workplace of all other DPI employees. Although Plaintiff's demeanor, statements and conduct was reserved, professional and respectful, DPI falsely accused Plaintiff of acting with hostility, of sowing chaos, of bullying, and of being disruptive.

15

41.d. Plaintiff disagreed with DPI's fundamental premise that "white systemic racism" is the cause of failing schools, and she objected to the ideas that she and all other white people are racists, and that "it's not enough to not be a racist, but [she] needed to be an 'anti-racist'" as that term was defined by DPI. Plaintiff stated that she found DPI's claims regarding systemic racism and the racism of all members of the white race, including her and other white employees, to be "disturbing" and "illegal." She added that DPI's practice of categorizing students or employees by their race, or deciding student placement based upon their race is illegal.

42. Shortly after the September 2021 meeting, DPI leadership met with Plaintiff's supervisor at CESA 7 and told him that Plaintiff would no longer be permitted to attend the monthly meetings with DPI. DPI also stated that Plaintiff could not be trusted and did not have an "equity mindset." DPI indicated that Plaintiff should be removed from the RSN and RPIC work entirely. Plaintiff's supervisor then explained that, because Plaintiff had a contract for the RSN and RPIC work through June 30, 2022, he could not remove her. DPI replied that Plaintiff was banned from attending any further RSN or RPIC monthly meetings.

43. Each month after September of 2021 until Plaintiff was terminated from her role on June 30, 2022, DPI continued to forbid her to attend RSN or RPIC monthly meetings. DPI committed that recordings of those meetings would be made available to Plaintiff, but that did not happen. Contrary to DPI's representations, DPI did not record all of the monthly meetings. Instead, none of those meetings were fully recorded. DPI failed to record some meetings in their entirety, and, for other meetings, DPI recorded only small portions of those meetings but turned off the recording when the discussion turned to matters of race and racial justice. DPI did not want Plaintiff, or parents of Wisconsin students, or the public to be aware of their racist agenda and ideology or of DPI's plans for Wisconsin students and Wisconsin schools.

**D. CESA 7 Fails to Stop DPI and Instead Facilitates and Participates in DPI's Racist Behaviors.**

44. CESA 7 did not prevent DPI from excluding Plaintiff from the monthly RSN and RPIC meetings, and from otherwise ostracizing and shunning Plaintiff because of her race and her opposition to DPI's racist agenda.

45. In April of 2022, DPI sent an "integrated" contract of renewal to CESA 7 for a variety of the work performed by CESA 7 for the DPI, including the RSN and RPIC work performed by Plaintiff. Although such contracts were issued by DPI to CESA 7 each year, for the first time ever, the contract included the following provisos:

The Agency shall assign staff to carry out the deliverables who:
- Have a demonstrated commitment to and experience in advancing equitable opportunities for student with IEPs and students of color such as but not limited :
  - providing educators with anti-racist and anti-ableist resources, and coaching their use with students;
  - facilitating conversations with district/school teams that explore potential bias among members related to race and ability.
- Have demonstrated commitment to examining their personal biases in the areas of race and ability, and to dismantling racist and ableist educations systems such as but not limited to:
  - engaging in professional learning to support interrogating the ways one's race, culture and understanding of ability inform the supports and services provided to adults in districts/schools including but not limited to: biases, stereotypes, prejudice and micro aggression;
  - educating others about systemic racism and ableism and the need to dismantle them.
- Have the demonstrated skills and willingness to coach district/school teams through an examination of race, racism, disability rights, and ableism such as but not limited to:
  - building the capacity of adults in the system to address inequities based on race and ability by leveraging coaching strategies as articulated in the Coaching Competency Practice Profile;
  - coaching district/school teams in understanding and mitigating their biases related to race and ability.
- Communicating in a manner consistent with DPI messaging, including messaging that is aligned with DPI's equity messaging and resources, including but not limited to:
  - the need to teach about race and racism, as well as disability and ableism;
  - the use of the Coaching Competency Practice Profile and the Model to Inform Equity to inform supports for schools and districts;
  - any other communications and messaging applicable to this agreement as directed by DPI.

17

46. The new contractual terms were clearly written in direct response to the opposition that Plaintiff had voiced to DPI's unlawful racist philosophy, attitudes and agenda.

47. Further, DPI plainly informed CESA 7 that, if Plaintiff were to continue in her role beyond June 30, 2022, (the end of her then-current contract with CESA 7), DPI would single her out for extra scrutiny and criticism of her work, and that, if Plaintiff failed to toe the line, DPI would immediately terminate the contract with CESA 7 and give the work to a third party. Later, DPI also plainly stated that, if Plaintiff continued in the role, DPI would no longer fund the work with CESA 7.

48. Because DPI pressured CESA 7, CESA 7 did not renew Plaintiff's contract to perform the RSN and RPIC work. CESA 7 removed Plaintiff from her role on June 30, 2022 (the day on which her contract expired), and demoted Plaintiff to a less prestigious job at less than one-half of her prior salary.

49. Throughout the final years of her tenure as RSN Director and RPIC coach for CESA 7, Plaintiff was continuously criticized, shunned, ostracized, harassed and discriminated against because of her race and because she opposed DPI's racist philosophy, agenda and actions.

50. DPI's philosophy, attitude and conduct is unabashedly built upon a racially-discriminatory premise and philosophy which provides that Plaintiff and all other DPI employees must be categorized first, foremost and exclusively by their race, and that – based solely on race – unassailable conclusions are drawn concerning employees' beliefs, attitudes and behaviors.

51. DPI makes employment decisions regarding the terms and conditions of employment for its employees - including Plaintiff - based upon its race-based philosophy, beliefs, and conclusions.

52. DPI's philosophy and application of that philosophy in Plaintiff's case was based-upon and motivated solely by Plaintiff's race. No other criteria, qualifications or facts were considered or tolerated by DPI. DPI's conduct, philosophy and agenda is race-based on its face, and DPI makes no attempt to hide that fact.

53. DPI subjected Plaintiff to adverse terms and conditions of employment solely because of her race and her opposition to DPI's racism; employees of color were not subject to the same adverse terms and conditions of employment.

54. DPI retaliated against Plaintiff by subjecting her to the adverse terms and conditions of employment enumerated above because she opposed DPI's racist philosophy and conduct.

55. CESA 7 was aware of all of the foregoing facts and incidents, but CESA 7 succumbed to the pressure created by DPI. CESA 7 permitted and failed to stop DPI's unlawful race discrimination, harassment, and retaliation against Plaintiff.

56. CESA 7 removed Plaintiff from her position because of her race and her opposition to DPI's illegal racist philosophy, attitude and agenda.

57.a. Because of Plaintiff's race and her opposition to DPI's illegal agenda, philosophy, attitude and conduct, CESA 7 demoted Plaintiff to another, less-prestigious and influential role that lies outside of her chosen field of expertise and in which she earns less than 50% of her former salary.

57.b. The conduct of both Defendants violated Plaintiff's constitutional rights including her constitutional right to equal protection under law.

58.a. In early August 2022, the Director of Special Education position with CESA 7 became available. CESA 7 had previously committed to give Plaintiff that position when it became available. Plaintiff applied for that role in mid-August. The job was filled with another

19

candidate one week after Plaintiff expressed interest in the role. Although Plaintiff was qualified to fill that role, and although CESA 7 had previously promised Plaintiff that role, CESA 7 refused to give her an interview and refused to offer her that position. CESA 7 made those decisions because of Plaintiff's race and her opposition to DPI's and CESA 7's racist attitudes, agendas and actions.

58.b. In January of 2023, Plaintiff applied for FMLA leave for her own serious health condition. Plaintiff completed the proper paperwork and provided the necessary medical certification completed by her healthcare provider. The medical certification provided by Plaintiff and her healthcare provider was complete and sufficient, raised no questions regarding authenticity, and required no clarification.

58.c. CESA 7 did not state in writing that any additional information was needed regarding Plaintiff's medical certification, nor did CESA 7 provide Plaintiff with at least seven days to cure any claimed deficiency in the certification form (including any question regarding the validity of the certification form.) In fact, through counsel, Plaintiff repeatedly requested that CESA 7 provide an explanation and clarification of its concerns regarding the validity of her medical certification form, but CESA 7 flatly refused to provide any such information.

58.d. Although CESA 7 had no legitimate reason to doubt the validity of Plaintiff's medical certification form, CESA 7 refused to approve Plaintiff's FMLA leave, and instead insisted that Plaintiff submit to an independent medical examination from a medical provider of CESA 7's choosing. To Plaintiff's knowledge, CESA 7 has never before insisted that an employee seeking FMLA leave submit to an independent medical examination.

58.e. CESA 7 intentionally interfered with, restrained and denied Plaintiff's exercise and her attempt to exercise rights provided under the FMLA. CESA 7 did so to harass and discriminate

against Plaintiff because of her race, and to retaliate against Plaintiff because of her opposition to DPI's and CESA 7's racist attitudes, agendas and actions.

## THE CLAIMS

59. Plaintiff restates and incorporates by reference the provisions of paragraphs 1 through 58 of this Complaint.

60. All of the allegations and facts raised in this Complaint give rise the following claims against Defendants:

a. DPI unlawfully categorized Plaintiff and singled her out for adverse treatment because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

b. DPI both threatened to - and did - unlawfully, unfairly and untruthfully criticize Plaintiff and her work and subject Plaintiff to unfair scrutiny because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

c. DPI unlawfully excluded Plaintiff from meetings with her colleagues, shunned her and ostracized her because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

d. DPI unlawfully denied Plaintiff access to information that she needed to effectively perform her job and which DPI made available to other similarly-situated employees who did not object to DPI's racist attitudes and actions.

e. DPI unlawfully criticized, shunned, ostracized and harassed Plaintiff because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

f. DPI unlawfully refused to fund the work performed by Plaintiff because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

21

g. DPI unlawfully refused to allow Plaintiff to continue in her role because of her race and because she opposed DPI's illegal racist philosophy, attitude and actions.

h. DPI unlawfully pressured Plaintiff to "admit" and embrace untrue "facts" about her race, including that Plaintiff has benefited from "white privilege" in her career and her employment with DPI, that institutions across the United States – including Wisconsin public schools – are permeated with "systemic racism," that all white employees of DPI (including Plaintiff) must embrace the fact that they and all white people are racists, and that change and racial equity can occur only if Plaintiff and other white employees of DPI embrace these alleged facts and commit to change.

i. DPI unlawfully retaliated against Plaintiff because she opposed DPI's racist and illegal philosophy, agenda and actions.

j. DPI unlawfully compelled Plaintiff's direct employer (CESA 7) to go along with, facilitate, and implement DPI's illegal and racist agenda, attitudes, actions, policies, philosophy and procedures.

k. As described above, on the basis of Plaintiff's race and her opposition to DPI's racist agenda, DPI unlawfully excluded Plaintiff from participation in, unlawfully denied Plaintiff the benefits of, and unlawfully subjected Plaintiff to discrimination under, programs and activities receiving federal financial assistance. A primary objective of such programs is to provide employment. Further, DPI's illegal and racist practices negatively affected the delivery of services to the ultimate beneficiaries of those programs.

l. DPI acted with malice, and a callous disregard of Plaintiff's federally protected rights, and DPI acted with deliberate indifference or reckless disregard of those rights.

22

m. The relevant decisions and actions of DPI were made by persons who possessed the authority to make final policy decisions on behalf of DPI.

n. CESA 7 unlawfully failed to resist DPI and to refuse to implement DPI's racist philosophy, agenda, attitudes and actions, and Plaintiff suffered harm as a result.

o. CESA 7 unlawfully failed to prevent DPI from illegally discriminating against Plaintiff, and retaliating against Plaintiff.

p. CESA 7 unlawfully demoted Plaintiff to a less prestigious job that pays less than 50% of her former wage.

q. CESA 7 unlawfully refused to promote and move Plaintiff into an available position for which she was qualified, which she requested, and which CESA 7 had previously promised to her because of her race and her opposition to the racist philosophy, attitudes, actions, and agenda of DPI and CESA 7.

r. While acting under color of state law, CESA 7 subjected Plaintiff to a deprivation of her rights, privileges and immunities secured by federal law and the U.S. Constitution, including - but not limited to - Plaintiff's rights to equal protection under the law, her right to speak, and her right to refrain from engaging in speech. DPI exercised such coercive power and provided such overt and covert encouragement to CESA 7 that the decisions made by CESA 7 are properly attributable to DPI and vice-versa.

s. As described above, on the basis of Plaintiff's race and her opposition to Defendants' racist agenda, CESA 7 unlawfully excluded Plaintiff from participation in, unlawfully denied Plaintiff the benefits of, and unlawfully subjected Plaintiff to discrimination under, programs and activities receiving federal financial assistance. A primary objective of such programs is

to provide employment. Further, CESA 7's illegal and racist practices negatively affected the delivery of services to the ultimate beneficiaries of those programs.

t. CESA 7 acted with malice, with a callous disregard of Plaintiff's federally protected rights, and with deliberate indifference or reckless disregard of those rights.

u. The relevant decisions and actions of CESA 7 were made by persons who possessed the authority to make final policy decisions on behalf of CESA 7.61. No similarly-situated employees of color were subjected to the same adverse terms and conditions of employment as was Plaintiff.

62. Despite the fact that Plaintiff met all of the qualification requirements of the FMLA, and despite the fact that CESA 7 had no reason to doubt the validity of the medical certification submitted by Plaintiff and her healthcare provider, CESA 7 refused and failed to comply with the regulatory process for questioning and/or challenging such a certification, refused to approve Plaintiff's FMLA leave, and instead insisted that Plaintiff submit to an independent medical examination from a medical provider of CESA 7's choosing. CESA 7 intentionally interfered with, restrained and denied Plaintiff's exercise and her attempts to exercise rights provided under the FMLA. CESA 7 did so to harass, discriminate against, and retaliate against Plaintiff because of her race and her opposition to DPI's and CESA 7's racist attitudes, agendas and actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in her favor and against CESA 7 and DPI as follows:

1. That the Court enter a finding of fact that the MICRP document, the CCPP document, and all similar documents, recordings, and materials reflect an unlawful racist agenda and philosophy. The Court should also find that Defendants' use of such documents, recording and materials and the promulgation of such racist ideals and goals in the workplace violates federal law, including Title VI and Title VII of the Civil Rights Act of 1964 and Section 1983. The Court should permanently enjoin Defendants from using or distributing the MIRCP document, the CCPP document, any variations of those documents, and any documents espousing racist ideals and goals in the workplace. Further the Court should permanently enjoin Defendants from implementing or advocating in the workplace for racist ideals as such ideals are expressed in the MICRP document, the CCPP document and similar documents, recordings, and materials written, promulgated or promoted by Defendants; and

2. That the Court permanently and immediately enjoin Defendants from implementing and promulgating any racist philosophy and agenda in any public school in the State of Wisconsin; and

3. That Plaintiff be awarded all lost wages and benefits suffered as a result of Defendants' illegal actions; and

4. That Plaintiff be reinstated to her former role as RSN Director and RPIC Coach with all benefits, wages and other perquisites of that position, or, in the alternative, that Plaintiff be awarded front pay and benefits from the time of judgment until the time that she would have chosen to retire from CESA 7; and

25

5. That Plaintiff be awarded punitive damages against CESA 7; and

6. That Plaintiff be awarded compensatory damages against both Defendants, including, but not limited to, medical expenses, damages for non-economic compensatory damages, damages for harm to professional reputation, emotional distress damages, and similar damages; and

7. That Plaintiff be awarded her reasonable attorneys' fees and costs; and

8. That Plaintiff be awarded such further relief as the Court deems just.

Dated this 28th day of July, 2023.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.

By:

Ross W. Townsend, Bar No. 1011622
Attorneys for Plaintiff
Law Firm of Conway, Olejniczak & Jerry, S.C.
231 South Adams Street
P. O. Box 23200
Green Bay, WI 54305-3200
Telephone: (920) 437-0476
Facsimile: (920) 437-2868
E-mail: rwt@lcojlaw.com

The Complainant, Becky Spengler, being first duly sworn, states that she has personally read the above document, and that the facts and allegations stated therein are true and correct to the best of her knowledge and belief.

Becky Spengler

Subscribed and sworn to before me this 28th day of July, 2023.

Notary Public, State of Wisconsin
My commission 9/15/2025

**JESSICA ANN YATES**
**Notary Public**
**State of Wisconsin**

4694204_4

26