UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BECKY SPENGLER,

        Plaintiff,

      v.                                 Case No. 22-C-1199

COOPERATIVE EDUCATIONAL
SERVICE AGENCY 7, a/k/a CESA 7, and
WISCONSIN DEPARTMENT
OF PUBLIC INSTRUCTION,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Becky Spengler filed this civil rights action against the Cooperative Educational Service Agency (CESA) that employed her, along with the Wisconsin Department of Public Instruction (DPI). Asserting claims under Title VII of the Civil Rights Act of 1964, Plaintiff, a white woman, alleges that she was subjected to adverse employment actions, including a hostile work environment, on account of her race and was retaliated against because of her opposition to the racist ideology that she claims DPI and CESA 7 adopted. Based on essentially the same allegations, Plaintiff claims that DPI and CESA 7, which receive federal financial assistance, also violated Title VI of the Civil Rights Act. Finally, she asserts claims against CESA 7 under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, and under 42 U.S.C. § 1983 for violations of her rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

The case is before the court on the defendants' motions for summary judgment. The court is required to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding such a motion, the court must view the evidence in the light most favorable to the opposing party. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). Because the parties offer starkly different versions of the evidence or, to be more precise, the inferences to be drawn from the evidence, it is worth emphasizing the court's limited role when considering a motion for summary judgment:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

With these principles in mind and based on the voluminous filings of the parties, the court provides the following summary of the parties' arguments and the facts in the light most favorable to Plaintiff.

## BACKGROUND

DPI is a state agency, headed by the state superintendent of public instruction, that advances public education in Wisconsin. It is divided into multiple divisions, one of which is the Division for Learning Support. The Division for Learning Support oversees the Special Education Team, which focuses on serving students with learning and emotional disabilities. The DPI Special Education Team's mission is to provide leadership to improve outcomes and ensure

2

appropriate free public education for students protected under the Individuals with Disabilities Education Act (IDEA).

Two of DPI's Special Education Team initiatives are directly relevant to this action: the Regional Special Education Network (RSN) program and the Research to Practice – Inclusive Communities (RPIC) project. The purpose of DPI's RSN project is to support Wisconsin local educational agencies (LEAs) in advancing educational equity for students with disabilities. The RSN project supports special education leadership throughout the State of Wisconsin, particularly directors of special education who serve students with Individualized Education Programs (IEPs). It provides coordinated technical assistance to LEAs to promote continuous systems improvement, foster collaboration, and develop educational leadership capacity. The purpose of the RPIC project is to provide high-quality evidence-based professional development to LEAs to positively impact educational outcomes of children with disabilities. School districts can voluntarily participate in the RPIC project.

DPI provided the funding and training for these initiatives under interagency agreements with the various Cooperative Educational Service Agencies (CESAs). CESAs are statutorily created agencies "designed to serve educational needs in all areas of Wisconsin by serving as a link both between school districts and between school districts and the state." Wis. Stat. § 116.01. CESAs "facilitate communication and cooperation among all public, private, and tribal schools, and all public and private agencies and organizations, that provide services to pupils." *Id.*

CESA 7 is one of 12 CESAs in Wisconsin, each of which covers a separate geographical area of the State. Plaintiff was hired as Integration Director by CESA 7 in 2018. At that time, Plaintiff had a Director of Special Education and Pupil Services certification. The job of the Integration Director is to "work in a myriad of service areas to insure integrated services of pupil

3

services and special education initiatives are blended within CESA 7 and its member districts." Dkt. No. 84-8 at 1.

Fulfillment of the RSN and RPIC duties are among the "Primary Functions or Responsibilities" of the Integration Director. *Id.* In her role as Integration Director, Plaintiff served as the RSN Director for CESA 7 and as a "coach" for the RPIC project. As RSN Director, Plaintiff was responsible for training and supporting the directors of special education within the 38 school districts in the CESA 7 region so that they could assist students with special needs to achieve better educational outcomes. The DPI website defines coaching as the "intentional, job-embedded professional learning designed to support teachers and staff in implementing practices with fidelity." *Coaching*, WIS. DEP'T OF PUB. INSTRUCTION, https://dpi.wi.gov/coaching (last visited Aug. 4, 2025). According to the website, "[c]oaching takes place after training and happens while practitioners are doing their work." *Id.* Plaintiff was one of ten coaches from various CESAs involved in the RPIC project. All of the coaches involved in the project were white.

In addition to her duties for the RSN and RPIC projects, Plaintiff had other responsibilities for CESA 7 related to pupil services, the Technical Assistance Network, and the Administrator and Teacher Development Center. Plaintiff supervised between seven and ten CESA 7 employees, including transitional coordinators, educational early childhood consultants, a CESA 7 project coordinator, and educational audiologists. She completed performance evaluations for the employees she supervised. Her job did not include direct contact with students.

Although the RSN and RPIC projects focused on special education services, DPI contends that "special education has a unique connection to race." Dkt. No. 101 at 6. In support of this contention, DPI cites several findings Congress made concerning equity and race in enacting or amending the IDEA. Congress found:

4

(A) Greater efforts are needed to prevent the intensification of problems connected with mislabeling and high dropout rates among minority children with disabilities.

(B) More minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population.

(C) African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts.

(D) In the 1998-1999 school year, African-American children represented just 14.8 percent of the population aged 6 through 21, but comprised 20.2 percent of all children with disabilities.

(E) Studies have found that schools with predominately White students and teachers have placed disproportionately high numbers of their minority students into special education.

20 U.S.C. § 1400(c)(12)(A)–(E). DPI contends that the RSN and RPIC projects are "designed to improve outcomes for students with disabilities by equipping special education directors and school administrators with the tools and knowledge necessary to address inequities in the educational system." Dkt. No. 101 at 7. DPI's goal is to promote "educational equity," which it defines as "[e]very student [having] access to the resources and educational rigor they need at the right moment in their education, across race, gender, ethnicity, language, ability, sexual orientation, family background, and/or family income." Dkt. No. 74-4 at 4.

Plaintiff contends that the "tools and knowledge" DPI claims are necessary to address inequities in the special education system constitute a racist ideology and that she was subjected to adverse employment actions because of her disagreement with that ideology and her refusal to personally adopt it. She contends that at the time of her hiring and for the first year or two of her employment, the focus of her work in the RSN and RPIC initiatives was to train school-based coaches to assist students with disabilities who have Individual Educational Programs (IEPs) in

5

the 38 school districts within the geographic area of CESA 7. After that time, however, she contends that DPI changed the focus of the RSN and RPIC programs to race.

Plaintiff contends that DPI adopted a "race-based agenda" with two primary components. Dkt. No. 113 at 4. The first component is a "belief system and philosophy" adopted by DPI that categorizes all people by race into two groups: white people and people of color. According to Plaintiff, DPI assigned negative attributes and behaviors to all white people as a group based solely on their race but drew no similar race-based conclusions about people of color. *Id.* at 4–5. The second component consists of DPI's demand that "Plaintiff and the other Integration Directors . . . not only teach and promote DPI's race-based agenda to the school-based coaches in the school districts in their respective territories but that they also demonstrate to DPI's satisfaction that they agreed with DPI and personally embraced the tenets of DPI's race-based agenda." *Id.* at 5.

What Plaintiff refers to as DPI's racist ideology is the theory known as critical race theory, which holds that racial disparity in various areas of life, including income, employment, wealth, arrests, criminal prosecution, prison population, and, in this case, inclusion in special education, is evidence of racism. Critical race theory views such disparity as the result of systemic racism, white privilege, and white supremacy, which the theory holds are endemic in American culture. "Critical race theory is more than a passing reference to race, racism, or even systemic racism. It focuses on the ways that legal rules facilitate the social construction of race by using whiteness as a normative baseline for colorblind analysis." Leah M. Watson, *The Anti-"Critical Race Theory" Campaign – Classroom Censorship and Racial Backlash by Another Name*, 58 Harv. C.R.-C.L. L. Rev. 487, 499 (2023).

As evidence of the first component—that DPI adopted a racist ideology that categorized by race—Plaintiff points to excerpts from DPI's Coaching Competency Practice Profile (CCPP)

manual which DPI provides to RPIC coaches. The glossary of terms at the beginning of the manual includes the term "whiteness" which is defined as "[a] dominant cultural space with enormous political significance, with the purpose to keep others on the margin (Alberta, 2021)." Dkt. No. 74-4 at 5. The manual continues, "Whiteness itself refers to the specific dimensions of racism that serve to elevate white people over people of color." *Id.* "This definition," the Manual continues, "counters the dominant representation of racism in mainstream education as isolated in discrete behaviors that some individuals may or may not demonstrate, and goes beyond naming specific privileges (McIntosh, 1989)." *Id.* The glossary also contains the term "white supremacy" which is defined as "[a]n ideology, as a collection of ideas that encourage us to value whiteness (white norms, white culture and white people) more highly and above other cultures. (Unitarian Universalist College of Social Justice, 2021)." *Id.* Left unstated and unidentified are what the "white norms" and "the specific dimensions of racism that serve to elevate white people over people of color" may be.

The Manual goes on to list components of "Coaching Competencies," the expected and developmental use in practice of each component, and an unaccepted variation. *Id.* at 6. One of the listed components is "[e]xamines and challenges oppressive policies and practices within systems." *Id.* at 9. The "expected use in practice" of this component reads: "The coach surfaces the impact of white supremacy and the history of whiteness on systems, works to disrupt and dismantle its effects, and facilitates action planning to build a more equitable system of education in its place." *Id.* The "developmental use in practice" reads: "The coach recognizes the impact of white supremacy and the history of whiteness on systems and inconsistently works to disrupt and dismantle its effects." *Id.* According to the Manual, the "unacceptable variation" is when "[t]he coach does not recognize how the history of whiteness has impacted systems." *Id.*

Plaintiff also points to statements from a DPI document entitled "Equity Mindset Cards –
A Coaching Tool" as further examples of the racist ideology that she claims DPI adopted.  Among
the statements she highlights are the following:

- Our educational system greatly disadvantages our students of color, students
  with IEPs, English language learners and students experiencing poverty.
  The Department of Public Education has made a commitment to address
  these unacceptable opportunity gaps at the systems level, knowing the
  inequities stem from the system, not from students and families who have
  been historically marginalized.

- Inequity is a result of systems and practices that benefit members of
  dominant groups and harm or provide little benefit to others.  Students and
  families don't need to "fix" themselves to fit into an educational system that
  wasn't designed with their needs in mind.

Dkt. No. 116, ¶ 29.

Plaintiff has also submitted copies of various articles and documents DPI provided
Integration Directors as part of their work on the RSN and RPIC initiatives: *Common Patterns of
Racist Attitudes and Behaviors of Many Whites*; *ICS Equity Non-Negotiables*; *What if . . . White
People Took Responsibility for Our Role in this Moment?*; *Nothing to Add: A Challenge to White
Silence in Racial Discussions*; *To Coach for Equity, Start by Looking Within*; *White Supremacy
Culture*; and *Leading for Equity: Our Mission Continues Despite CRT Turmoil*.  Dkt. No. 129,
¶ 8.f.  She also received a DPI handout entitled *Equity: Wisconsin's Model to Inform Culturally
Responsive Practices*.  Dkt. No. 115, ¶ 10; Dkt. Nos. 115-1–15-9.

Plaintiff contends that the implicit or explicit message of these and other instructional and
training materials DPI provided is that "all White people (including Plaintiff) have various
negative attributes and engage in various negative behaviors." Dkt. No. 113 at 6.  She argues that
the training and program materials that DPI provided reflect a racist ideology.  In her view, to

define whiteness as "the specific dimensions of racism that serve to elevate white people over people of color" is itself racist. *Id.* at 5.

As for the second component of DPI's race-based agenda—the claim "that DPI would not permit Plaintiff to do the job of Integration Director unless she spread DPI's agenda in the 38 school districts in CESA 7's territory and she demonstrated – to DPI's satisfaction – her agreement with and commitment to the first component of DPI's race-based agenda"—Plaintiff points to the same materials and the monthly meetings DPI hosted for RSNs and RPIC coaches. *Id.* at 6. As evidence from the materials, she offers the following statements from the CCPP:

- "Developing one's knowledge of self and understanding of the historical context of who has benefited and who has not is essential for effective, transformative system change."

- A "component of the [equity mindset] competency" is that the coach "analyzes oppressive beliefs and feelings within oneself."

- The "expected use" of an "equity mindset" by coaches includes "the willingness and ability to see and speak how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others."

- "The coach models self-awareness . . . when examining their social and personal identities. The coach intentionally disrupts the ways in which their social and personal identities uphold inequities."

- "Unacceptable variations" include: coaches who are "unwilling and/or unable to see and speak to how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others."

- "'Unacceptable variations' also include the coach who rarely models self-awareness . . . . The coach does not recognize the ways in which their social and personal identities uphold inequities."

*Id.* (quoting CCPP, Dkt. No. 74-4 at 8). Plaintiff also cites other similar statements that appear in other publications and program materials provided by DPI. *Id.* at 6–7.

9

It was primarily in the course of the monthly meetings DPI hosted for RSNs and RPIC coaches that Plaintiff contends DPI and CESA 7 implemented the second component of the race-based agenda. As an example, Plaintiff notes that during the July 25, 2019, RSN meeting, there was a discussion about an optional and voluntary book study where participants would read and discuss the book WHITE FRAGILITY – WHY IT'S SO HARD FOR WHITE PEOPLE TO TALK ABOUT RACISM. Dkt. No. 118, ¶ 23. Plaintiff declined to participate in the book study because she feared her views of the book's thesis would not be appreciated by the other members of the group. DPI Special Education Team member Erin Faasuamalie replied that Plaintiff's political views were "the elephant in the room" and she was "not sure what to do with this now." Dkt. No. 126, ¶ 14.

Plaintiff did not agree with the views expressed in the materials or those of her colleagues on topics such as systemic racism, white privilege, and bias, and she initially tried to keep her views to herself. This changed over time, however, as the meeting participants were encouraged to read an article entitled *From Safe Spaces to Brave Spaces: A New Way to Frame Dialogue Around Diversity and Social Justice*. Dkt. No. 115-1. The point of the article was that the participants in groups addressing social justice issues (such as the RSN group) should eschew "safety" and should instead embrace "bravery" by sharing their views even if those views are controversial and are deemed "unsafe" by others.

Given this invitation, Plaintiff offered as an example of a "brave" verses "safe" response what she experienced after she declined to participate in the study of the book WHITE FRAGILITY in July of 2019. She described how she overhead several members of the RSN group—including Faasuamalie, who led most of the meetings, and Deb Wall, CESA 8 RSN and statewide RSN coordinator—making derogatory remarks about her because of her views on so-called "white fragility" and racism which differed considerably from views of DPI leadership and the views of

the other RSNs in the group. Among the statements made, Plaintiff states she heard Faasuamalie say, "As someone who would support Donald Trump or Scott Walker, Becky is the one person who needs to participate in a book study about white privilege," and "Anyone who voted for Donald Trump support[s] racist beliefs." Dkt. No. 126, ¶ 14. Plaintiff's point in recounting the incident, but without naming the participants, was that she did not believe their meetings were always a safe place for her to honestly share her views. Not only did Faasuamalie not criticize Plaintiff for recounting the incident, but she noted Plaintiff's comments were "fair" and then apologized for her comments, noting she had been guilty of not practicing what she preached. Wall likewise apologized. Dkt. No. 81-8 at 79–81, 84.

Perhaps encouraged by this response, over the following months, Plaintiff "openly – but respectfully and professionally – questioned, challenged and opposed" what she viewed as "DPI's increasingly-radical views on race and systemic racism." Dkt. No. 117 at 7. The record supports Plaintiff's claim that she "never raised her voice, spoke disrespectfully, used profanity or sarcasm, ignored requests or directions of DPI, or otherwise behaved unprofessionally toward DPI or any of her colleagues." *Id.* at 8.

The conflict in views came to the fore, however, during the RSN meeting on September 15, 2021, when Plaintiff inadvertently sent the entire group a message intended only for her husband. The message read:

> You will not believe this recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS. I should have assumed it when I was hired. It should [not] be a surprise to me. We need to take this conversation to another call with Lynn Winn [DPI's Assistant Director of Special Education]. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead [sic] me into pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. Me: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that."

Dkt. No. 118, ¶ 100.  Realizing her mistake, Plaintiff immediately sent the following message to the group:

> Maybe it was my subconscious at work there, you know that I made that mistake and shared a private Facebook message that I had sent my husband, but it is what it is, I did it.  And I don't regret sharing it with my husband, because I have to have somebody to talk to you about, but I need you all to hear this today that my opinion matters too and those of you who have reached out to me even privately and personally over the lunch break to tell me that you would like to hear a different perspective, I need the group to hear that too that other people want that, and I have it, but you're not listening so I'm going to be here, but I'm going to be here today at the rest of the meeting, more as just observing and taking it in because I'm just frankly too upset to even move on as a participant.

*Id.*, ¶ 101.

On September 16, 2021, Julia Hartwig, DPI's Director of Special Education, emailed Jeff Dickert, CESA 7's Agency Administrator, to request a meeting to address "repeated concerns" that had been brought to DPI's attention regarding Plaintiff and the RPIC and RSN projects.  A meeting was set up for the following week.  Dkt. No. 114, ¶ 14.  Around the same time, Plaintiff spoke with Dickert about DPI's "race-based agenda."  *Id.*, ¶ 15.  On September 20, 2021, Plaintiff thanked Dickert for meeting with her and sent him a copy of the updated CCPP.  *Id.*, ¶ 16.  Also, on September 20 and on September 21, 2021, Dickert received a screenshot of the chat messages that Plaintiff inadvertently sent to the group chat during the September RSN meeting.  *Id.*, ¶ 18.  Dickert was "troubled by" Plaintiff's message.  *Id.*, ¶ 19.

On October 4, 2021, Hartwig emailed Dickert stating that she had discussed the matter with Lynn Winn and wanted to "be clear on our preference, and at the same time respecting your organizational structure and supervision of Becky."  Dkt. No. 118, ¶ 132.  Hartwig wrote that "our strong preference is that Becky no longer be assigned to the RSN and RPIC projects," but that they understood that she was under contract with CESA 7 and that other assignments might not be

readily available within CESA 7. *Id.* If Dickert was unable to reassign her for the remainder of the contract year, Hartwig noted that DPI requested that Plaintiff "not attend statewide meetings for either of these projects until a reparation process can take place due to the significant negative impact she continues to have on individuals and group dynamics of the projects." *Id.* Hartwig assured Dickert that DPI would not consider her lack of attendance at these meetings as not meeting the requirements of the project because it is at DPI's request. *Id.*

Despite her personal disagreements with what she regarded as DPI's race-based agenda, Plaintiff contends that she still did the job of Integration Director and did it well. Dkt. No. 117 at 6. Plaintiff contends she faithfully spread DPI's messaging to the 38 school districts in CESA 7's territory. Her performance reviews by Dickert were uniformly positive, she received a significant salary increase, and she was praised by the school-based coaches in CESA 7's territory with whom she worked. Dkt. No. 119-1.

Dickert met with Plaintiff on October 5, 2021. Dkt. No. 114, ¶ 29. In the course of their meeting, Plaintiff told Dickert that during meetings and discussions and in the hallways, she was being excluded from the group. She indicated that she felt bullied because she did not believe in systemic racism. Plaintiff stated that she could do her job, even though she did not believe that the system was racist, but that Winn told her she could not do this job if she did not believe in the work. *Id.* In response to Plaintiff's complaints, Dickert sent Hartwig the following email:

> I think we would like to investigate a different path on this than your suggestion.
>
> I need to look at more evidence as my employee is the one feeling bullied for having a different mindset than the DPI on this lead into the coaching work.
>
> She claims to have numerous examples of being called out at the meetings as a Republican, conservative, and even racist. As you stated, this is supposed to be a safe zone for discussion, and dissenting opinions. I have a feeling that more needs to be done, then just eliminating this employee from the work. This employee does

13

the work that needs to be done, and is highly respected in our Region. I am confident that she will do Justice to the RSN work and the RPIC.

Dkt. No. 118, ¶ 133. Dickert further noted that he had previously advised Hartwig that "this may be a rabbit hole you are heading towards as an organization – leading coaching with a breakdown of one's whiteness" and apparently referenced a recent recall election for school board members in the Mequon-Thiensville School District in which critical race theory was a central issue. *Id.* In the meantime, Dickert suggested that Plaintiff would observe the upcoming RPIC and RSN video meetings but remain on mute so as to "give DPI and CESA 7 time to work through this issue." *Id.*

Hartwig responded to Dickert's email the same day, agreeing to have a follow up conversation and to allow Plaintiff to listen to recordings of the RSN and RPIC meetings. *Id.*, ¶ 134. On October 6, 2021, Plaintiff emailed Dickert during the RPIC meeting. She advised that she could get the same benefits from watching the recorded meetings and suggested that Dickert ask that she have access to the recordings the day after each RSN and RPIC meeting occurs. *Id.*, ¶ 135.

Dickert met with Hartwig, Winn, and Paul Manriquez, the Assistant State Superintendent of the Division for Learning Support, on October 11, 2021. *Id.*, ¶ 136. During the meeting, Dickert shared several examples of instances in which Plaintiff believed she was bullied at RSN meetings, including being called a Republican, a conservative, and a racist. She claimed she was told she did not understand the materials as presented and also complained of being isolated by the group. Dkt. No. 114, ¶ 32. The DPI representatives told Dickert that DPI "respects" Plaintiff's "different viewpoint" and that "much of the work is about equity." *Id.*, ¶ 34. They also told Dickert that Plaintiff's presence at the meetings was a "problem" and that DPI had hired an external facilitator to help with meetings. *Id.* On October 12, 2021, Dickert emailed Hartwig advising that Plaintiff

would not attend the RSN or RPIC meetings and would watch the recordings the next day. Dkt. No. 118, ¶ 138.

On December 10, 2021, Dickert, Winn, and Hartwig met to discuss the contract year 2022–2023. *Id.*, ¶ 139. Winn and Hartwig expressed that they would like to see Plaintiff spend less time in the RSN and RPIC projects. *Id.* Dickert, Winn, and Hartwig met again on February 23, 2022, to discuss whether Plaintiff would continue in the position for the 2022–2023 contract year. *Id.*, ¶ 140. During the meeting, the DPI representatives indicated that they did not want Plaintiff in the position. *Id.* Winn and Hartwig reported to Dickert that, without Plaintiff attending the meetings, they were more cordial and team-like. *Id.*, ¶ 141.

Dickert subsequently met with Plaintiff on February 23, 2022, and told Plaintiff that Hartwig and Winn informed him that they would be taking away the RPIC coach position and would not fund Plaintiff in the RSN position. Dkt. No. 114, ¶ 41. Hartwig emailed Dickert on February 24, 2022, stating: "Per your request, I am sending this email to let you know that it is our preference that Becky Spengler not be assigned to the RPIC and RSN Projects for the 2022-2023 contract as we have concerns about how she has been carrying out the terms of the contract. I appreciate your responsiveness and partnership as we've worked through this." *Id.*, ¶ 42. Dickert forwarded the email to Plaintiff on March 3, 2022. *Id.*

Dickert met with Plaintiff on March 4, 2022, and asked Plaintiff for evidence or examples of discriminatory actions by DPI so he could do his due diligence and investigate Plaintiff's complaints. *Id.*, ¶ 43. At the meeting, Dickert understood that Plaintiff believed she was being discriminated against for not believing in systemic racism and because of her viewpoints on DPI's messaging about equity and her political stance. *Id.*, ¶¶ 44–45.

15

On March 9, 2022, Dickert emailed Winn and Hartwig requesting another in-person meeting. He listed four items for discussion: (1) Dickert heard from a CESA 7 school district that CESA 7 would not be receiving RPIC funds, (2) clarification on what DPI meant by its "preference" that Plaintiff not be in the RPIC and RSN roles or whether DPI would not fund her in those roles, (3) evidence of DPI bullying Plaintiff, who has a philosophical belief in contrast to DPI's belief in "privilege" and "bias," and (4) Dickert's personal concern regarding the "white privilege" or "privilege" material. *Id.*, ¶ 46; Dkt. No. 64-23 at 2. Although DPI stated it simply "preferred" that Plaintiff not be in the RPIC and RSN roles, Dickert understood that, if Plaintiff was in the RPIC position, DPI would cut off funding for the position for 2022–2023 year, but if she did not occupy the RPIC position, CESA 7 would receive funding from DPI for that position. Dkt. No. 114, ¶ 47. Dickert was subsequently informed that DPI believed that Plaintiff was creating a hostile environment for other people. *Id.*, ¶ 49.

Plaintiff emailed Dickert on March 19, 2022, stating: "These are just a few, but significant, examples of how I believe DPI has discriminated against me for my political views and for questioning the work around white privilege, etc. There are more, but for now, these give you an idea." *Id.*, ¶ 50. Plaintiff attached a five-page document to her email, in which she recounts in July 2019 overhearing comments being made by various individuals, including members of the DPI Special Education Team, about "'people who voted for Donald Trump' or 'anyone who supported Scott Walker'" and realized "that the majority of the group leaned Left and did not support any Conservative thinking." Dkt. No. 84-25 at 1. Plaintiff also describes a conversation with Lynn Winn in which Winn stated that "if we don't believe in this, then perhaps this work isn't for us." *Id.* at 4. Plaintiff then recounts her requests at an August 2021 meeting for "actionable steps" the participants could take to address the "systemic racism" DPI insisted they needed to

16

address. *Id.* at 5. She states no specifics were provided. *Id.* After reviewing the document, Dickert indicated he could understand how Plaintiff could interpret some of the behavior as bullying, but he did not see the behavior as bullying or any evidence of a hostile work environment. Dkt. No. 114, ¶ 54.

Dickert met with DPI representatives on May 3, 2022. After the meeting, he realized that CESA 7 would not receive funding and Plaintiff would not be able to attend the DPI trainings if she continued in her RSN and RPIC roles. *Id.*, ¶ 59. Dickert also met with Plaintiff and Colleen Timm, the Learning Services Director for CESA 7, on May 3, 2022. Dickert and Timm shared with Plaintiff their takeaways from the meeting with DPI and their concerns that if they placed her in the RSN and RPIC roles, she would be monitored by DPI and DPI could pull the funding, which would result in a lapse of service for CESA 7's districts and region. *Id.*, ¶ 63. Timm relayed to Plaintiff that DPI had expressed that certain points in the Integrated Contract regarding an equity mindset were non-negotiable and that CESA 7 could keep Plaintiff in the Integration Director role if Plaintiff could commit to the role without pushback or questioning. *Id.*, ¶ 61.

Plaintiff stated in response that she believed that DPI had an equity focus and required an equity mindset as an RSN and RPIC coach. *Id.*, ¶ 62. She also reiterated that she believed her performance reviews and pay raise demonstrated that she was doing the work and could continue to do the work but that she could not surrender her personal freedom or feelings "as it relates to what DPI was asking [her] to do." *Id.* Plaintiff emailed Dickert and Timm on May 12, 2022. She wrote:

> Thank you for meeting with me yesterday to discuss DPI's demands with regard to my position as an RSN and RPIC coach. I sincerely appreciate the support provided by both of you and your acknowledgement that I am fully able to effectively perform the actual work of an RSN and RPIC coach. Although you didn't say it, I also understand that your hands are tied, that DPI completely controls and dictates the "what" and "how" of this work, that DPI also controls the purse strings for this work,

17

and that DPI will ultimately decide whether or not I am allowed to keep my job. As you know, I have successfully performed this work – including the anti-racist work that DPI is now emphasizing – for several years with great success and without complaint regarding my performance from any District, CESA 7, or DPI. I am committed to continue to perform the work just as I have in the past. In that regard, I will also commit to continue to behave as I always have in a professional and respectful manner in all my dealings with DPI, CESA 7, the Districts, and anyone else. However, I will continue to maintain my own personal views and opinions regarding matters of race, and I will not agree to waive my right to express those views in the same respectful manner as any other employee of DPI and/or CESA 7 might express their views. I am not a racist nor do I harbor bias toward any person based on race, and I will not confess to sins that I have not committed. Neither will I continue to consent to be the only employee who is excluded from meetings because of my race, nor will I agree to submit to special, unique and racially-discriminatory DPI monitoring of my work where such monitoring applies to me and me alone. Although I will continue to effectively carry out DPI's direction with regard to the RSN and RPIC work within the Districts, I will not agree to keep silent regarding DPI's racist philosophy, policies, and plan of action. Instead, I will retain my right to continue to oppose racial discrimination in the workplace. I hope that DPI will do the right thing. In any case, I look forward to their decision.

*Id.*, ¶ 64. Plaintiff met with Dickert and Timm on May 17, 2022, and told them that she felt DPI was retaliating against her for her views and behaviors. *Id.*, ¶ 69. Plaintiff did not continue in the Integration Director position for the 2022–2023 contract year. But she remained employed by CESA 7 in a different position until her employment was terminated in August of 2024, almost two years after the action was commenced. Additional facts, including those related to Plaintiff's FMLA claim, will be set forth as necessary in the analysis below.

## ANALYSIS

### A. Title VI, Title VII, and Equal Protection Claims

The landmark legislation known as the Civil Rights Act of 1964 was intended to end racial discrimination in voting, public accommodations, public education, federally assisted programs, and employment. Plaintiff alleges that she was subjected to adverse employment actions in violation of Titles VI and VII of the Act, 42 U.S.C. § 2000e-2, including demotion and a hostile work environment on account of her race and was retaliated against, in violation of 42 U.S.C.

18

§ 2000e-3, because of her opposition to the racist ideology that she claims DPI and CESA 7 adopted. CESA 7 contends it cannot be liable to Spengler under Title VI because she was its employee, and DPI contends that it cannot be liable to Plaintiff under Title VII because it was not her employer. To this argument, Plaintiff counters that DPI was her indirect employer and thus does have liability under Title VII. Plaintiff also contends that she was a beneficiary or participant under a program provided by DPI, an agency that receives federal funds and, thus, DPI could also be liable under Title VI of the Civil Rights Act, which prohibits subjecting any person to discrimination on the ground of race, color, or national origin, under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. She contends that the defendants are liable under both Title VI and Title VII. It is undisputed that DPI and CESA 7 receive federal financial assistance for its programs. Dkt. No. 97, ¶ 56.

Instead of addressing which Title of the Civil Rights Act of 1964, if any, may apply to which defendant, however, it is first worth asking whether Plaintiff has presented evidence from which a reasonable jury could conclude that DPI and/or CESA 7 discriminated against her on the basis of her race or retaliated against her because she complained of or objected to such discrimination. Plaintiff, who is white, does not claim that she was subjected to discrimination by DPI or CESA 7 because she is white. In fact, at the time Plaintiff was involved in the RPIC project, all ten of the coaches involved in the project were white, as was the director of CESA 7 and the DPI personnel who were involved. Dkt. No. 118, ¶ 14. Plaintiff's claim, instead, is that she was discriminated against because of her opposition and refusal to submit to what she characterizes as the racist ideology imposed by DPI and in which CESA 7 acquiesced.

Plaintiff's claim is predicated on a narrow legal question: Does the adoption and promotion of the tenets of critical race theory by DPI and CESA 7 constitute a violation of Title VI or Title

VII of the Civil Rights Act.  Unless the answer to this question is "yes," Plaintiff's claim fails at

the outset as a matter of law.  Neither Plaintiff nor the defendants have cited any case that addresses

this precise issue, and the answer is not readily apparent from the text of the particular provisions

at issue.  Title VII provides:

> (a) Employer practices
>
> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.  In regard to retaliation, Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Title VI likewise prohibits exclusion from participation in, denial of

benefits, or subjecting to discrimination under any program or activity receiving federal financial

assistance on the basis of race.  42 U.S.C. § 2000d.

To establish a prima facie case of racial discrimination under Title VII or Title VI, a

plaintiff must present evidence that her employer subjected her to an adverse employment action

because of her race.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("That legal

standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that

the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other

adverse employment action.").  Being demoted for objecting to an employer's opinion or ideology
is not the same as being fired because of one's race.  As the court pointed out at the hearing on the
defendants' motions, presumably, a black employee who shared Plaintiff's views on critical race
theory, a Thomas Sowell, for example, or most other black conservatives, would be subject to the
same treatment.  If, as Plaintiff contends, DPI and CESA 7 demoted her because she did not share
DPI's views on critical race theory and systemic racism, and thus in their view she could not
perform the work required under her contract, it would seem to follow that a "person of color"
who did not share those views would be likewise unable to perform the work DPI and CESA 7
required.  Yet, such a person would be hard-pressed to claim that he was demoted because of his
race.

This is not to say that Plaintiff's claim that critical race theory is a racist ideology is
unreasonable.  Plaintiff is not alone in viewing critical race theory as a racist ideology.  In April
2022, Florida Governor Ron DeSantis signed into the law of that State the Individual Freedom
Act, also called the Stop W.O.K.E. Act.  *See* Ch. 2022-72, Laws of Fla.  Governor DeSantis
described the Act as "a stand against the state-sanctioned racism that is critical race theory."
*Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race
Theory in Schools and Corporations*, NEWS RELEASE (Dec. 15, 2021), https://perma.cc/9VV7-
7YCE.  The Act "prohibits Florida's public schools from 'subject[ing] any student or employee to
training or instruction that espouses, promotes, advances, inculcates, or compels such [individual]
to believe' any of eight concepts descended from critical race theory."  *Pernell v. Fla. Bd. of
Governors of State Univ.*, 84 F.4th 1339, 1341 (11th Cir. 2023) (citing Fla. Stat. § 1000.05(4)(a)).
For example, the Act stops schools from teaching that "[m]embers of one race, color, national
origin, or sex are morally superior to members of another;" that "[a] person, by virtue of his or her

race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;" or that "[a] person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." *Id.* (quoting § 1000.05(4)(a)(1), (2), (6)). Other states have enacted similar laws. According to one source, "[t]he vast majority of states have introduced anti-Critical Race Theory measures, and at least eighteen states have banned Critical Race Theory." Lia Epperson, *Truth-Telling in Legal and Political Movements for Equality: Debunking Critical Race Theory Myths*, 68 HOW. L.J. 53, 62 (2024). Neither the State of Wisconsin nor the federal government has enacted a similar law, however, and so the question presented in this case is whether Plaintiff has submitted evidence from which a jury could determine that the adoption of critical race theory by DPI and CESA 7 violated her rights under Titles VI and VII.

Critical race theory differs significantly from the understanding that led to the passage of the Civil Rights Act of 1964. The civil rights movement that led to the passage of the Civil Rights Act of 1964 had as its goal the elimination of racial discrimination so as to bring to fulfillment the promise of human equality set forth in the Declaration of Independence as envisioned by the Equal Protection Clause of the Fourteenth Amendment. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States."). The end was a colorblind society where individuals would be free to rise or fall on their own effort and ability without regard to the color of their skin. Critical race theory rejects the goal of a colorblind society. Watson, *supra* at 495–96 ("Ignoring race altogether has a negative impact. Colorblindness is associated with a greater level of prejudice, both unconscious/implicit

and conscious/explicit, and is often used as a justification for inequality." (internal quotation marks and citation omitted)).

In place of the colorblind society with equal opportunity for all, critical race theory seeks the elimination of racial disparity. Under this theory, all or most disparities between "whites" and "people of color" in material wealth and social standing are due to white racism that is traced back in history to the time of slavery and segregation but continues to this very day in the form of what is called "systemic racism." Under this view, disparate impact is deemed conclusive evidence of racial discrimination. Thus, the congressional finding that "African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts," 20 U.S.C. § 1400(c)(12)(C), is viewed by DPI as a consequence of the "systemic racism" that its RSN and RPIC initiatives were intended to address in an effort to achieve "educational equity" and close the gap in educational achievement that exists between white students and students of color.

Many people, not just Plaintiff, strongly disagree with disparate impact theory. In the words of Judge Ho of the Fifth Circuit, "[t]here's a big difference between prohibiting racial discrimination and endorsing disparate impact theory." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring) (citing WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION 78 (1994) (disparate impact is "a significant leap away from" intentional racial discrimination)). Judge Ho continued:

> It's the difference between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race. It's the difference between color blindness and critical race theory. *Compare* Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs and Freedom (Aug. 28, 1963) ("I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."), *with* IBRAM X. KENDI, HOW TO BE AN ANTI-RACIST 18 (2019) ("A racist policy is any measure that produces or sustains racial inequity between racial groups."); *see*

*also 'When I See Racial Disparities, I See Racism.' Discussing Race, Gender and Mobility*, N.Y. TIMES (Mar. 27, 2018), *available at* https://www.nytimes.com/interactive/2018/03/27/upshot/readerquestions-about-race-gender-and-mobility.html?smid=tw-share.

*Id.* Moreover, in Judge Ho's view, disparate impact theory leads directly to the very racist practices that laws prohibiting racial discrimination are intended to prevent:

> Prohibiting racial discrimination means we must be blind to race. Disparate impact theory requires the opposite: It forces us to look at race—to check for racial imbalance and then decide what steps must be taken to advance some people at the expense of others based on their race.

*Id.*; *see also Students for Fair Admissions*, 600 U.S. at 218 ("The race-based admissions systems that respondents employ also fail to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype.").

But while disparate impact theory may be a simplistic theory of human behavior or an unwarranted sociological assumption, even one that can be used to justify racially discriminatory practices, it is not itself a violation of either Title VI or Title VII of the Civil Rights Act. It is not even clear that it can properly be considered a "racist ideology," at least as the term racism is commonly understood. Racism is defined as "a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 962 (10th ed.). Neither critical race nor disparate impact theory falls within this definition. To the contrary, disparate impact theory assumes that people of all races are equally qualified for and/or interested in all occupations and pursuits, and thus, the only explanation for the under-representation of "people of color" in at least some of the more lucrative occupations or pursuits must be racial discrimination. It likewise views all racial disparity in criminal prosecution, prison populations, and, in the context of this case, inclusion in special education, as evidence of racial discrimination. Under this theory, all

races and cultures are equal, meaning the same, and thus, absent white racism, all racial groups should be equally represented in all areas of civic life. Critical race theory is viewed as a response to the alleged white superiority that its proponents claim still exists in society. On the other hand, critical race theory appears racist to many since it seems to consider people primarily as members of a particular race, not as individual members of the human race.

But regardless of whether critical race theory is considered racist or not, DPI's embrace of it does not, by itself, constitute a violation of Title VI or Title VII of the Civil Rights Act of 1964. Ultimately, it is not the role of the judiciary to dictate to the States what theory accounts for the racial disparity that exists in various areas of life. The role of the judiciary is to apply the law as it has been enacted by Congress and, as enacted, Titles VI and VII of the Civil Rights Act of 1964 prohibit discrimination on the basis of race, not ideology. Plaintiff's racial discrimination claims against both DPI and CESA 7 fail because Plaintiff has not presented a prima facie case that she was discriminated against by either DPI or CESA 7 on account of her race. Viewing the evidence in the light most favorably to Plaintiff, it was her opposition to DPI's agenda, not her skin color, that led to her demotion. The fatal flaw in Plaintiff's theory of liability is that the Civil Rights Act proscribes racially discriminatory actions; it does not prescribe theories or ideas that can lead to racially discriminatory actions. Presumably, this is why those seeking to ban critical race theory have turned to their state legislatures instead of to the courts.

In an effort to show that adoption of critical race theory as a factual matter amounts to discrimination against her because of her race, Plaintiff argues that DPI required, as a condition of her employment, that she confess that she herself, as a white person, was a racist. Of course, this is no small matter. Racists are despised by the vast majority of people, and racism is properly viewed in this country as a serious moral and intellectual failing. A black person who was fired

25

because he refused to confess to having such a flaw, Plaintiff contends, would properly be viewed as suffering discrimination on account of his race. And if it would amount to a violation of Title VII to condition a black employee's employment on such a condition, it would likewise constitute a violation of Title VII to impose a similar condition on white employees, since the standard for establishing discrimination under Title VII is the same regardless of whether the plaintiff is black or white. *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1546 (2025) ("Our case law thus makes clear that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group.").

Plaintiff's argument fails, however, because she has not submitted evidence from which a reasonable jury could conclude that she was required to personally admit to being a racist as a condition of her maintaining her position. Careful review of the evidence does not support her claim. To be sure, some of the program and instructional materials provided by DPI do state that many, even most, white people have racist attitudes and engage in racist behaviors. For example, Exhibit B to the declaration Plaintiff submitted in opposition to the defendants' motions for summary judgment is a copy of a handout she and other Integration Directors received from DPI as part of their training on the RSN and RPIC initiatives entitled *Common Patterns of Racist Attitudes and Behaviors of Many Whites*. Dkt. No. 115-2. The document lists 41 examples of such attitudes and behaviors, such as:

> 1. Believe they have "earned" what they have, rather than acknowledge the extensive white privilege and unearned advantages they receive; believe that if people of color just worked harder. . . ;
>
> 2. Not notice the daily indignities that people of color experience; deny them and rationalize them away with PLEs (perfectly logical explanations);
>
> 3. Work to maintain the status quo and protect the advantages and privileges they receive;

26

4. Believe that white cultural norms, practices and values are superior and better;

5. Internalize the negative stereotypes about people of color and believe that whites are smarter and superior to people of color;

6. Want people of color to conform and assimilate to white cultural norms and practices.

*Id.* at 1 (cleaned up).

These statements, like those in most of the DPI materials, are so vague and non-specific as to be almost meaningless. For example, what specifically is meant by the "extensive white privilege and unearned advantages" that accounts for individual achievement and what are the "daily indignities" that people of color face? What are the "white cultural norms and practices" that the supposed racists think are superior and better and that others should adopt? Given the generalities used to describe the various attitudes and behaviors, it is difficult to assess what the author is saying other than those who interact with students receiving special education services and their families should take care to avoid any biases, whether conscious or unconscious, they may have.

Moreover, it is clear from the title of the document that it does not convey the belief that white people are inherently racist. It speaks not of the behaviors and attitudes of all whites but of "many whites." The last section of the handout offers a list of "productive actions to shift racist dynamics." *Id.* at 3. These include:

42. Track patterns of differential treatment of people of color and intervene to stop inappropriate actions and educate others;

43. Continually learn more about the experiences of people of color and the dynamics of racism;

44. Recognize when people of color might be reacting out of cumulative impact, and offer space to talk about issues and their experience;

45. Analyze policies and practices with a Race lens to assess any negative differential impact on people of color and/or unearned privilege and access for whites; intervene to create change;

46. Constantly track daily organizational activities to ensure fairness, respect, and inclusion for all people with respect to group dynamics, communication, task assignments, hiring, promotions, professional development opportunities, decision-making, conflict management, mentoring, networking, etc.

*Id.* (cleaned up). The fact that the handout offers steps to correct "racist dynamics" indicates that people are not inherently racist and that, to the extent one has expressed such attitudes or engaged in such behaviors in the past, he or she is able to overcome or correct such tendencies.

Another of the DPI handouts Plaintiff emphasizes is *What if . . . White People Took Responsibility for Our Role in this Moment* by Kathleen Osta, Managing Director of the National Equity Project. Dkt. No. 115-4. Osta cites Ibram X. Kendi for the proposition that "there is no such thing as a 'not-racist' — our actions are either racist or anti-racist. If we are serious about justice, if we are serious about peace, we don't get to spend our time being 'neutral' white people — because there is no neutral." *Id.* at 3. Osta continues, "As white people committed to justice, it is our responsibility to move beyond the idea that we are 'not-racist' and therefore, not implicated in racism, to an understanding of ourselves as either racist, by virtue of our action or inaction, or anti-racist by virtue of what we are willing to interrupt, demand, and put on the line." *Id.* at 4. One may disagree with Osta's (and Kendi's) view of what a racist is, but she is not claiming that all white people are inherently racist. If that were the case, why call on them to become anti-racists? More importantly, Plaintiff has offered no evidence that her complete agreement with all of the positions set out in the handouts DPI provided was a condition of her employment.

Plaintiff seems to view her exchange with DPI Special Education Team member Faasuamalie during the September 15, 2021, RSN meeting as proof that she was required to confess to being a racist as a condition of her employment. She believed that Faasuamalie, and

28

thus DPI, had "incriminated themselves . . . big time" during this exchange. Dkt. No. 118, ¶ 100. However, she overstates the import of the exchange. As noted above, Plaintiff wrote in the chat intended only for her husband but unintentionally sent to the entire group that "I got them to say I can't do this work if I don't believe in all this antiracism BS." *Id.* The transcript of the meeting and the contemporaneous chat, however, do not support her claim.

During the course of the meeting, Plaintiff brought up Martin Luther King's appeal to a colorblind society where people would be judged by the content of their character and not the color of their skin and asked why that no longer seemed to be the goal. Dkt. No. 81-40 at 100. Faasuamalie responded that if you are colorblind, you're not recognizing people, the culture that they come from, and the beliefs that may play a part in their lives. *Id.* at 100–01. She noted that "the focus of the work DPI was funding was around equity and advancing opportunities to eliminate race inability [sic] as predictors of success or failure, so that is the focus of the Agency and funded staff in the positions you hold." *Id.* at 101. Faasuamalie then suggested that if Plaintiff did not agree with the focus, she should continue to reflect and determine if she could do the work with "the full buy in and support that you would offer if you did agree with it." *Id.* Faasuamalie also suggested that she could bring in DPI's "in house equity person" to speak with Plaintiff as well. *Id.* at 102.

Plaintiff responded that she appreciated the clarification, but then stated her question is "how you would do the work, then, if you didn't believe that as a fact, but as a theory as one possible theory." *Id.* "It sounds like," she continued, "my avenue to explore that then is to reflect on it, and if I can't come to that conclusion then maybe I have to consider whether or not the work is right for me today." *Id.* Faasuamalie replied, "I think that would be accurate, you know, I think that it's just like any position in the world. So, let's say you go into teaching and decide that you

29

don't necessarily agree with the curriculum, you can decide to stay and teach, or you can move on to another position." *Id.* Faasuamalie added, "you know I'm not suggesting, Becky, that I want to lose you as an RSN, but I also am saying you know, this is the agency's effort or focus and of the work, and you know we are going to continue to engage in this work, and if you struggle with it, you know I'm not sure how I can best support you other than to continue to provide these opportunities for learning and growth, and you know I think if you want to engage in the conversation further we could certainly invite Lynn and have another conversation around that." *Id.* at 102–03.

Plaintiff suggested further reflection would not change anything and would not close race-based gaps. She then said, "I think it's interesting that it sounds like in order to do the work you have to agree with this, and this means being told how to feel and I don't know what to do with that, because you can't tell somebody how to feel." *Id.* at 103–04. Faasuamalie responded, "That's fair; I agree." *Id.* at 104. Plaintiff also made the point that she was having trouble conveying DPI's message to some of the school districts within her area because people did not agree with it and would become particularly heated when the subject came up. *Id.*

Plaintiff raised the issue again in a chat during a presentation after lunch. She wrote: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that." Dkt. No. 81-41 at 4. After several other participants offered their thoughts, Plaintiff added, "I would be curious to hear how DPI would answer that, but not sure who to ask, because I've asked it several times with no real answer." *Id.* at 5. Faasuamalie then responded: "While I don't have 'research' at my fingertips, I would argue that there is historical evidence of policies that demonstrate systemic racism. I would agree that everyone has blind spots with regard to race.

I wish I had an answer to Becky's question about how someone does this work if they have a counter belief to it. I would imagine that it makes the work challenging if you don't believe in it."

*Id.*

It was shortly after this exchange that Plaintiff inadvertently sent the message intended for her husband to the entire group. That message, once again, read:

> You will not believe this recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS. I should have assumed it when I was hired. It should be a surprise to me. We need to take this conversation to another call with Lynn Winn. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead [sic] me into pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. Me: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that."

*Id.* at 6.

DPI describes this incident as "the tipping point" that ultimately led to DPI's request to CESA 7 that Plaintiff no longer be assigned to the RSN and RPIC projects. It notes that "multiple RSN group members . . . expressed to DPI their discomfort and frustration with [Plaintiff's] behavior, noting its negative impact on the group's morale and trust." Dkt. No. 101 at 8. Plaintiff, on the other hand, views DPI's reaction to her chat as a "smoking gun" clearly establishing her claims. She interprets DPI's reaction to her inadvertent group message as proof that a condition of her employment was the requirement that she admit being a racist and as retaliation for her refusal to do so.

But that is not what Faasuamalie said. She simply agreed with Plaintiff that it would be difficult for her to carry out her responsibilities under the RSN and RPIC initiatives if she did not believe in the message the projects were intended to convey. At no point did Faasuamalie, or any other DPI officer or employee, tell Plaintiff that she was required to admit that she, as a white

31

person, was a racist, as a condition of her employment as an Integration Director or her participation in the RSN and RPIC projects. No such admission was made by any of the other participants in the group meetings. Thus, Plaintiff has failed to offer evidence of the second component of her argument. What the transcript of the meeting and chats do reveal is that Plaintiff was trying to get Faasuamalie and DPI to say things that would incriminate themselves "big time." It was for this reason that DPI insisted that Plaintiff no longer participate in the RSN and RPIC meetings, not because of the color of her skin.

In short, Plaintiff has failed to offer evidence from which a reasonable jury could conclude that she suffered discrimination based on her race or retaliation because of her complaint about or opposition to an unlawful employment practice. And because the same standards apply for proving an equal protection claim under § 1983, *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003), Plaintiff's equal protection claim against CESA 7 fails as well. For this reason, the defendants are entitled to summary judgment on her Title VI and Title VII claims.

## B.  Family Medical Leave Act Claim

Plaintiff asserts that CESA 7 interfered with her efforts to exercise her FMLA rights. The FMLA provides that an eligible employee may take up to twelve weeks of leave during any twelve-month period if she is unable to perform the functions of her position because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). An employer is prohibited from interfering with the exercise of or the attempt to exercise any right under the FMLA. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780 (7th Cir. 2013) (citing 29 U.S.C. § 2615(a)(1)). "An employee claiming FMLA interference must show that: (1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer 'interfered with, restrained, or denied FMLA

benefits to which he was entitled.'"  *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023)

(quoting *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022)).  An employer who violates

§ 2615 by interfering with, restraining, or denying an employee's exercise of FMLA rights is liable

for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other

monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for

"appropriate" equitable relief, including employment, reinstatement, and promotion,

§ 2617(a)(1)(B).

"When an employee initially requests FMLA leave, the employer may take the employee

at his word and grant the request, or 'may request certification by the employee's healthcare

provider.'"  *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 837 (7th Cir. 2014) (quoting

*Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 886 (7th Cir. 2005)).  The health care provider's

certification for an employee who claims a serious health condition that renders her unable to

perform the functions of her position "shall be sufficient" if it provides "the date on which the

serious health condition commenced," "the probable duration of the condition," "the appropriate

medical facts within the knowledge of the health care provider regarding the condition," and "a

statement that the employee is unable to perform the functions of the position of the employee."

29 U.S.C. § 2613(b)(1)–(3), (4)(B).

The FMLA also "circumscribes the employer's right to challenge a physician's

certification that is FMLA-qualifying."  *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313

(7th Cir. 1998) (citing 29 U.S.C. § 2613); *see also Hansen*, 763 F.3d at 837.  The employer may

require that the employee obtain a second opinion, at the employer's expense, when it has reason

to doubt the validity of the certification provided by the employee's health care provider.  29

U.S.C. § 2613(c).  If the second opinion differs from the opinion in the certification provided by

33

the employee, the employer may require that the employee obtain a third opinion, also at the employer's expense. § 2613(d)(1). "The opinion of the third health care provider concerning the information certified under subsection (b) shall be considered to be final and shall be binding on the employer and the employee." § 2613(d)(2).

Plaintiff argues that CESA 7 interfered with her FMLA rights, forcing her to "jump through unnecessary hoops by requiring her to return to Wisconsin for the first [independent medical examination] IME and requiring her to submit to a second IME *seven weeks after* the need for any leave whatsoever had ended." Dkt. No. 113 at 37. She suggests that because the medical certification completed by APNP Leasum was legally sufficient, CESA 7 had no basis to ask for a second (or third) opinion. But the statute expressly authorizes the employer to request a second opinion when it has "reason to doubt the validity of the certification" provided by the employee's health care provider. 29 U.S.C. § 2613(c).

Neither the statute nor the related regulations, *see* 29 C.F.R. § 825.307, explain what qualifies as "reason to doubt the validity of the certification." Courts have found that requests for second opinions may be based on doubts as to the "sufficiency or veracity of the certification," *Nett v. Milwaukee County*, No. 04-C-534, 2006 WL 2517896, at *15 (E.D. Wis. Aug. 25, 2006), or based on an "honest suspicion that [the] application for FMLA leave was not legitimate," *Barnes v. LaPorte County*, No. 07-CV-297, 2008 WL 5263364, at *3 (N.D. Ind. Dec. 16, 2008). Specifically, as reasons to doubt the validity of the medical certification, Timm noted that Plaintiff would not be seeking medical treatment until the day after her leave ended; the certification sought leave for the exact time period when Plaintiff had been working remotely in Florida the two years prior; and the certification stated that Plaintiff could not "communicate effectively with clients and CESA 7 employees" or perform "all duties" because of her condition, yet Timm believed that

34

Plaintiff had been communicating effectively with clients and CESA 7 employees and performing all of her job duties since the onset date of the alleged condition. Dkt. No. 114, ¶ 79.

Plaintiff disputes that CESA 7 had a legitimate basis to doubt the validity of the medical certification she submitted. *Id.*, ¶¶ 78–79. She asserts that the fact that her condition began on October 12, 2021, but did not incapacitate Plaintiff or make her unable to effectively communicate with clients or CESA 7 employees until slightly more than a year later is neither remarkable nor cause for suspicion because some progressive medical conditions may commence long before the condition leads to substantial incapacitation. Plaintiff also argues that the fact that she might not need medical treatment while on medical leave is "precisely the sort of medical decision that FMLA properly leaves to the medical professionals – not the employee's layman supervisor." *Id.*, ¶ 79. Although Plaintiff disagrees with the reasons for Timm's doubts about the validity of the medical certification, the court finds that she had an "honest suspicion" to request a second opinion.

Plaintiff also contends that she was prejudiced because she was compelled to travel from Florida to Wisconsin and back to spend substantial parts of two days submitting to the examinations. But there is no dispute that Plaintiff never requested an alternate date, alternate provider, or alternate location for the second examination. *Id.*, ¶ 87. Though Plaintiff maintains that CESA 7 would not have considered any request she would have made, her assertion is based only on her speculation.

In this case, CESA 7 had reason to doubt the validity of the first medical certification, so it requested a second opinion. The second opinion conflicted with the first, so CESA 7 sought a third opinion. *See* 29 U.S.C. § 2613(d)(1). The third opinion concluded that Plaintiff was not able to perform one or more of her essential job functions, and CESA 7 accepted that opinion as

required by law. CESA 7 had provisionally approved Plaintiff's FMLA leave while it was obtaining the second and third medical opinions, as required by 29 C.F.R. § 825.307(b)(1), and officially approved her FMLA leave. In short, CESA 7 did not interfere with Plaintiff's efforts to exercise her FMLA rights, and CESA 7 is entitled to summary judgment on this claim.

## C. First Amendment Retaliation Claim

Plaintiff asserts that CESA 7 violated her First Amendment rights by retaliating against her because of (1) her political beliefs, (2) what she said, (3) what she declined to say, (4) what she believed, and (5) what she declined to believe. Generally speaking, a government employer may not retaliate against its employees for exercising their right to free speech. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To establish retaliation under the First Amendment, a plaintiff must show (1) she engaged in activity protected by the First Amendment, (2) she suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Plaintiff asserts that CESA 7 retaliated against her not just because of what she said but because of her political beliefs—what she believed and what she declined to believe. CESA 7 argues that Plaintiff never alleged these claims in her complaint, despite amending it twice. Plaintiff cites to the following paragraphs in her Second Amended Complaint to support her argument that she brought claims that CESA 7 retaliated against her because of her political beliefs, what she believed, and what she declined to believe:

> Defendants' insistence that Plaintiff cease expressing her views and that she instead "demonstrate" her agreement with Defendants' racist philosophy, conduct and actions violated Plaintiff's constitutional rights including her right to speak and to refrain from speaking.

36

Despite her positive job performance and track record, Defendants repeatedly informed Plaintiff that she could not properly perform the Director of Integrated Services job unless she believed and otherwise agreed with and embraced DPI's racist philosophy, programs, and actions. Defendants' conduct violated Plaintiff's constitutional rights including, but not limited to, her rights to speak and to refrain from speaking.

The conduct of both Defendants violated Plaintiff's constitutional rights including her constitutional right to equal protection under law.

While acting under color of state law, CESA 7 subjected Plaintiff to a deprivation of her rights, privileges and immunities secured by federal law and the U.S. Constitution, including – but not limited to – Plaintiff's rights to equal protection under the law, her right to speak, and her right to refrain from engaging in speech. DPI exercised such coercive power and provided such overt and covert encouragement to CESA 7 that the decisions made by CESA 7 are properly attributable to DPI and vice-versa.

Dkt. No. 33, ¶¶ 37.h, 41.b, 57.b, 60.r. These allegations do not provide CESA 7 with notice of Plaintiff's claim that it retaliated against her because of her political beliefs, what she believed, and what she declined to believe. Because Plaintiff did not assert these claims in her complaint, the court will not consider them. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment. By then, [Defendant], relying on [Plaintiff's] second amended complaint, had not received the fair notice required by the federal pleading rules." (citations omitted)).

With respect to Plaintiff's assertion that CESA 7 retaliated against her based on what she said, Plaintiff lists seven statements she made that she contends constitute protected speech. Dkt. No. 113 at 42–46. In particular, at the July 21, 2021, RSN meeting, Plaintiff challenged DPI's practice of selectively choosing not to record "controversial" portions of the RSN and RPIC meetings. *Id.* at 42. At the August 11, 2021, and September 15, 2021, RSN meetings, Plaintiff warned DPI about the consequences of attempting to "foist its race-based agenda on school districts." *Id.* at 43–44. At the September 8, 2021, RPIC meeting, Plaintiff warned DPI that its

37

race-based agenda was "illegal and immoral." *Id.* at 44. During a September 16, 2021, telephone call with DPI Special Education Team member Rachel Fregien, Plaintiff advised that DPI's race-based agenda was "illegal and immoral" and criticized Fregien's "unjust and derogatory" statements about parents who opposed efforts by local Wisconsin school districts to implement critical race theory in their districts. *Id.* at 45. In a May 12, 2022, email to Dickert and Timm, Plaintiff advised that DPI was engaging in illegal activity. *Id.* at 46.

As an initial matter, CESA 7 argues that Plaintiff's September 8 and September 16, 2021, statements cannot form the basis of a valid First Amendment claim because Plaintiff's supervisor was not aware of those instances of speech until after Plaintiff filed her lawsuit. Plaintiff has not cited any evidence to show that her supervisor knew about these statements. This failure is fatal to her claim. *See Wackett v. City of Beaver Dam*, 642 F.3d 578, 582 (7th Cir. 2011) (defendants entitled to summary judgment where plaintiff failed to present any evidence that defendants knew about plaintiff's allegedly protected speech).

Next, CESA 7 argues that Plaintiff's remaining statements were not constitutionally protected speech. In order for a public employee to raise a successful claim under the First Amendment, she must have spoken in her capacity "as a private citizen and not as an employee." *See Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008). Indeed, a public employee's speech receives constitutional protection only if it "(1) was made as a private citizen; and (2) addressed a matter of public concern." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

38

Plaintiff asserts that she made her statements as a private citizen because nothing about her "official duties" pertained to the secrecy of DPI meetings or obligated Plaintiff to warn DPI about its conduct. But Plaintiff's focus on her "'core' job functions is too narrow." *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (citing *Garcetti*, 547 U.S. at 423). "Whether speech is made 'pursuant to' official duties is broader than an employee's job description." *Fehlman v. Mankowski*, 74 F.4th 872, 875 (7th Cir. 2023). An employee's statements about misconduct involving her workplace is considered "official-capacity speech," even if the employee is not "ordinarily responsible for investigating misconduct." *Id.* (citing *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013)).

Based on the record, the court concludes that Plaintiff was speaking pursuant to her official duties when she spoke at the RSN and RPIC meetings. As CESA 7's Integration Director, Plaintiff was required to attend the RSN and RPIC meetings. Plaintiff did not speak as a citizen. Instead, she spoke in her capacity as a public employee contributing to the group discussions regarding DPI's messaging. Because Plaintiff's comments were made in her role as a public employee, they are not subject to First Amendment protection. *See Callahan v. Fermon*, 526 F.3d 1040, 1045 (7th Cir. 2008) ("[Plaintiff] did not speak as a citizen when he attended the meeting; he went to work and performed the tasks that he was paid to perform." (citing *Garcetti*, 547 U.S. at 422)).

Ultimately, Plaintiff's First Amendment claim seeks to elevate her own free speech rights above the government's right to determine policy. The First Amendment, however, does not prevent the government from adopting policies or expressing views with which its employees may disagree:

> When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work. Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to

39

simultaneously transmit the views of disappointed Yankees fans.  The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks.

*Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 251–52 (2022) (citations omitted); *see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy.").  This is even more true when the government seeks to implement its policies and transmit its views through the employees it hires for that very purpose.

Finally, Plaintiff raises a compelled speech claim.  She asserts that Defendants compelled her to "share the tenets of DPI's race-based agenda within the school districts in her territory." Dkt. No. 113 at 48.  "The First Amendment protects both the right to speak and 'the right to refrain from speaking.'"  *Kilborn v. Amiridis*, 131 F.4th 550, 562 (7th Cir. 2025) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  Public employees receive certain protection "against compulsion by their employer to endorse messages they find objectionable." *Id.*  CESA 7 argues that Plaintiff's compelled speech claim fails because she never engaged in any compelled speech. Plaintiff does not dispute that she never spoke any of the compelled speech.  Therefore, her compelled speech claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment (Dkt. Nos. 96 & 100) are **GRANTED**.  The clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of August, 2025.

William C. Griesbach
United States District Judge

40